IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JHASS GROUP L.L.C. aka J. HASS GROUP, LLC;
JASON D. HASS; JEREMY R. HASS; JEFFREY HASS,
*Plaintiffs/Appellants*

*v.*

ARIZONA DEPARTMENT OF FINANCIAL
INSTITUTIONS; LAUREN W. KINGRY,
Superintendent,
*Defendants/Appellees.*

No. 1 CA-CV 13-0546
FILED 10-20-2015

Appeal from the Superior Court in Maricopa County
No.  LC2012-000639-001 DT
The Honorable Crane McClennen, Judge

**AFFIRMED**

COUNSEL

Timothy H. Barnes, P.C., Phoenix
By Timothy H. Barnes
*Counsel for Plaintiffs/Appellants*

Arizona Attorney General's Office, Phoenix
By Natalia A. Garrett
*Counsel for Defendants/Appellees*

---

## OPINION

Judge Michael J. Brown delivered the Opinion of the Court, in which Presiding Judge Peter B. Swann and Judge Kenton D. Jones joined.

---

**B R O W N**, Judge:

¶1　　　　This appeal arises from a challenge to an administrative order imposing a $150,000 fine for failure to comply with Arizona Revised Statutes ("A.R.S.") section 6-715, which requires a debt management company operating in Arizona to obtain a license from the Arizona Department of Financial Institutions ("the Department"). A debt management company is defined as a person or entity that for compensation "engages in the business of receiving money, or evidences thereof, . . . as agent of a debtor for the purpose of distributing the same to his creditors[.]" A.R.S. § 6-701(4). Because we conclude a company that exercises substantial control over funds deposited by its client with a third party falls within the definition of a debt management company, we affirm the superior court's order upholding the administrative order.

## BACKGROUND

¶2　　　　J. Hass Group, LLC, owned by three brothers (Jason, Jeremy, and Jeffrey Hass), was formed in February 2008.[1] JHass engaged in the business of negotiating debt settlements on behalf of its clients. The company acquired many of its clients from an existing debt settlement practice conducted by Jason D. Hass, PLC, a law firm owned by Jason Hass. JHass also acquired clients through outside marketing companies that recommended debt relief products to potential clients in exchange for a portion of JHass' fees.

¶3　　　　The business model JHass developed was ostensibly quite simple: JHass charged its clients various fees to enroll in its "debt settlement program" and, in exchange, JHass negotiated with clients' creditors to achieve a reduced obligation that would allow clients to satisfy their unsecured debts more quickly. Each client signed a "Client Partnership Agreement" with JHass. In addition, clients executed a limited

---

[1]　　　Unless otherwise noted, we refer to all the plaintiffs—J. Hass Group, LLC, JHass Group, L.L.C., and the three principals—as "JHass."

power of attorney allowing JHass, among other things, to share information regarding clients' account balances with creditors and review client account histories.

¶4            Prospective clients would often complete the Client Partnership Agreement with the help of a marketing company, which would then submit the signed documents directly to JHass through an online system. Completion of the agreement required prospective clients to disclose their existing debts and credit card information. The JHass online system used this "list of debts" to calculate an estimated monthly payment and the number of months to complete the debt settlement program.

¶5            Enrollment in the program required clients to fund the following: (1) a "Monthly Professional Fee," which JHass charged for "continuing customer service and account administration," (2) a "Monthly Maintenance Fee," which JHass used to cover the cost of "trust account administration," and (3) "Client Savings," to be used to settle debts. According to the Client Partnership Agreement, JHass' fees would be deducted from the client's monthly savings. Clients were encouraged to deposit more than the "monthly payment amount" when their budgets allowed. JHass did not receive its fees directly from the clients. Instead, as a condition of enrollment in the program, clients were required to establish a "trust or controlled account" at a "bank, Escrow Company, or other financial institution or service company reasonably acceptable to [JHass]."[2]

¶6            Although JHass did not have a contractual relationship with any third-party account providers, many JHass clients set up accounts with NoteWorld Servicing Center, LLC ("NoteWorld"), an escrow agent independently licensed by the Department. When enrolling in the program, a client seeking to establish an account with NoteWorld would also execute a "Sign-up Agreement" authorizing NoteWorld to perform a number of services related to JHass, the client's chosen debt settlement

---

[2]      Jason Hass testified at the administrative hearing that a third-party account was not mandatory because clients had the option to use a "self-save" model in which the client could open a personal savings account specifically dedicated for use in the JHass program, rather than using a third-party account. According to Jason, a "handful" of clients were "self-savers," but there were no business records to show (1) that any clients actually used this method, or (2) how JHass would implement its debt settlement model with a self-saver.

company ("DSC"). These services included receiving, processing and posting payments, holding such payments in a trust account, disbursing funds as authorized, and providing account and transaction information. NoteWorld charged clients a monthly fee for its services, in addition to the fees charged by JHass.

¶7        NoteWorld held client funds in a single trust account at an FDIC-Insured bank, but kept a specific accounting of each client's individual balance in a "customer account." Once the Sign-up Agreement was executed, the client received online access to monitor the account balance. As part of the agreement, clients provided their bank account information and authorized NoteWorld to debit their personal checking accounts via monthly Automatic Clearing House ("ACH") transfers according to a schedule of debits provided by either JHass or the clients.

¶8        JHass was able to access the NoteWorld online system, NoteWorld Reporter ("NWR"), to provide NoteWorld with instructions regarding disbursements from client accounts to both creditors and JHass itself. NoteWorld maintained a user interface that allowed DSCs like JHass to use NWR to submit a client's personal bank account information and payment plan, create and modify a schedule of debits, and trigger disbursements from the client's account. For this purpose, JHass maintained a "Banking Department," which was responsible for entering client information into the JHass internal systems and NWR. Although JHass was able to create a schedule of debits in NWR, clients did not have that authority, and NoteWorld treated payment requests from JHass "as if" they came directly from the clients. However, if clients wanted to skip a periodic debit from their personal bank accounts, they could contact NoteWorld, which would cancel the debit up to two days before the scheduled release date.

¶9        Each monthly debit from a client's private account automatically triggered a disbursement to JHass in payment of the monthly maintenance and professional fees charged for participation in the debt settlement program. JHass would also allocate the total fee charged per debit between JHass and any entities with which JHass had a fee-splitting arrangement, such as the marketing companies. Although clients reviewing their account balances could see that a portion of their monthly debit had been disbursed for "fee payments," the clients could not control the allocation or view how the total fee was allocated among JHass and its affiliates.

¶10 Depending on the particular terms of the Client Partnership Agreement, some of the client's initial payments were allocated entirely to JHass as a "down payment" for the program. After the down payment, clients continued to deposit funds into their NoteWorld accounts until sufficient funds, or "reserves," had accumulated so that JHass could begin negotiating with creditors. If the creditors agreed to a proposed settlement, JHass presented the offer to the client for consideration. If the client accepted, JHass would access NWR to schedule a disbursement from the client's account to that creditor.

¶11 Per the Sign-up Agreement, NoteWorld disbursed funds from the client's account to creditors "upon receipt of a settlement letter from the [client's] DSC" or a creditor. A representative of NoteWorld clarified that even though NoteWorld required a settlement letter, if a payment was scheduled in NWR, NoteWorld had no way to verify that a settlement letter was received before the payment had been processed. In NWR, disbursements to creditors were treated differently than the schedule of debits from clients' personal checking accounts to their NoteWorld accounts and to DSCs. The terms of the Sign-up Agreement provided that the client could approve or decline a disbursement to a creditor within 24 hours of NoteWorld's receipt of notice of settlement. If the client took no action, the disbursement was deemed approved by the client and could not be revoked. Once a disbursement was made to a creditor, NoteWorld could not refund a client's account.

¶12 Throughout this process, JHass continued to collect its monthly professional and maintenance fees in the form of scheduled debits from the client's NoteWorld account. While the account was open, JHass could modify the schedule of debits by accessing NWR. Clients had the option to communicate directly with NoteWorld regarding their accounts and disbursements, or to contact JHass, which would then relay the clients' requests to NoteWorld. However, if JHass gave a conflicting request, NoteWorld would seek confirmation from both parties before taking any action.

¶13 According to NoteWorld, a JHass client had the ultimate authority to cancel an account entirely or request a refund for fees paid. JHass could request a refund on behalf of the client, which, if granted, NoteWorld would credit to the client's account after deducting any fees owing to JHass or others. If JHass instructed NoteWorld to cancel a particular account, NoteWorld would do so, apparently without any explicit confirmation from the client.

¶14    By January 2011, both the Department and the Arizona Attorney General's Office had received a number of consumer complaints against JHass.  These complaints shared many common criticisms, including that the JHass program was not clearly explained before enrollment, JHass representatives were difficult to reach, and creditors were never paid.  One client asserted she had signed up for the program through one of the marketing companies JHass used to acquire customers, and did not know she had enrolled in a program with JHass until the marketing representative "disappeared."  Although the JHass Client Partnership Agreement does not require clients to stop paying creditors, some clients complained that the marketing company representatives or JHass employees instructed them to stop paying creditors as a condition of enrollment.  However, those that stopped paying creditors received repeated phone calls from creditors or faced legal action because the clients' payments were being distributed to JHass to pay program fees rather than to creditors.  The complaints also alleged that when clients eventually withdrew from the JHass program, they were not refunded the remaining balance of their NoteWorld accounts because JHass claimed it was entitled to all or some portion of the remainder for additional fees due, even though JHass often had provided no services.  All the complainants described their financial circumstances at the conclusion of their dealings with JHass as being significantly worse than before enrolling in JHass' program.

¶15    The Department investigated JHass and its business practices for possible unlicensed activity, starting with the substance of the JHass contract as compared to that of a licensed debt management company.  Reading it in conjunction with assertions made on the JHass website and the NoteWorld Sign-up Agreement, an agent for the Department determined that the JHass Client Partnership Agreement raised several "red flags," particularly that JHass was charging a fee for trust account administration.  After several months of investigation, the Department's agent made a written recommendation to the Superintendent that JHass was engaged in unlicensed activity.

¶16    Because JHass had no debt management company license and did not fall within any of the licensure exemptions listed in A.R.S. § 6-702, the Superintendent issued a cease and desist order, alleging JHass was operating a debt management company in violation of A.R.S. § 6-715.  The order also sought civil penalties from JHass and its principals.  In its subsequent notice of hearing and complaint, the Department alleged that JHass was engaged in the business of a debt management company, because for purposes of A.R.S. § 6-701(4), the conduct of "receiving money, or evidences thereof" includes "the activity of exercising actual or

constructive control over another person's funds, bank or trust accounts(s) for purposes of distributing the monies to creditors." The Department further alleged that JHass' access to client account information and authority to give instructions to NoteWorld on behalf of clients demonstrated that JHass assumed control over client funds held in NoteWorld accounts.

¶17 During a five-day evidentiary hearing, the Department presented testimony from the investigating agent and the Assistant Superintendent of the Department about the nature of the consumer complaints, the investigation, and the Department's interpretation of A.R.S. § 6-701(4). A NoteWorld operations manager also testified at length about the relationship between NoteWorld, JHass, and JHass clients, as well as the specific authority that JHass had over NoteWorld accounts. Five former JHass customers, all of whom had filed complaints, testified as to their understanding of the JHass debt settlement program and as to which entity controlled the funds they had paid into a NoteWorld account. All three Hass brothers testified, and the Department submitted substantial documentary evidence, including consumer complaints, correspondence between JHass and its clients, NoteWorld representatives and the Department, and thousands of pages detailing NoteWorld's records of JHass client accounts.

¶18 The administrative law judge ("ALJ") issued a decision affirming the cease and desist order. Relying on cases from other jurisdictions, as well as the Department's interpretation of the statute, the ALJ concluded that "receiving money" as used in A.R.S. § 6-701(4) includes constructive receipt or possession. The ALJ then determined the weight of the evidence established that JHass was in "constructive receipt or possession of its clients' funds by virtue of the authority and control that it was able to exercise over those funds." The ALJ pointed to the following activities of JHass, which, viewed together, were tantamount to receiving money for purposes of distributing the same to creditors:

      a. receiving personal/banking information;

      b. setting up a consumer trust account for its clients with a third party (e.g., NoteWorld);

      c. viewing and having access to [clients'] account information, including the ability to edit account information;

d. the use and submission of clients' ACH information to NoteWorld and creditors of clients;

e. submitting debit instructions or scheduling of debits, causing money to be deposited into or transferred out of the account to creditors;

f. having managed, directed, administered, or [overseen] payments to creditors.

Based on these activities, the ALJ concluded that JHass acted as an agent of the debtors by "arranging to have and having access to debtors' funds through NoteWorld's system and exercise[ing] control through NoteWorld over the debtors' funds for the purpose of effectuating money transfers to debtors' creditors for compensation." The ALJ also determined that the Department's request to impose a fine of $150,000 was reasonable and supported by the evidence. The Superintendent adopted the ALJ's decision in whole and issued a final decision and order.

¶19 JHass sought judicial review in superior court. After briefing and oral argument, that court affirmed the final decision and order, finding the Department did not abuse its discretion and its actions were neither contrary to law nor arbitrary and capricious. The court also concluded that substantial evidence supported the Department's decision. JHass then timely appealed to this court.

## DISCUSSION

¶20 In reviewing an administrative agency's decision, the superior court examines the record to determine whether the agency's action was contrary to law, arbitrary, capricious, or an abuse of discretion. A.R.S. § 12-910 (E); *Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 436, ¶ 11 (App. 2009). On appeal, this court must determine whether the record contains substantial evidence to support the superior court's judgment. *Carley v. Ariz. Bd. of Regents*, 153 Ariz. 461, 466 (App. 1987). Neither the superior court nor this court may substitute its judgment for that of the agency on factual questions or matters of agency expertise. *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 336 (App. 1984). As to questions of statutory interpretation, however, we are not bound by the superior court's or the agency's legal conclusions. *Siegel v. Ariz. State Liquor Bd.*, 167 Ariz. 400, 401 (App. 1991).

### A.    Arizona's Regulation of Debt Management Companies

**¶21**    The Department is charged with "the execution of the law of [Arizona] relating to financial institutions and enterprises."  A.R.S. § 6-110. In addition to debt management companies, the Department also regulates banks, credit unions, escrow agents, mortgage brokers, consumer lenders and other institutions.  The primary responsibility of the Department, acting through its chief officer, the Superintendent, is to license or certify financial institutions and to oversee periodic examinations of the business affairs of the institutions within its purview.  *See* A.R.S. §§ 6-122, -123.

**¶22**    As provided in A.R.S. §§ 6-701 through -716 ("Chapter 6"), debt management companies operating in Arizona must obtain and renew annually a license to operate.  A.R.S. §§ 6-703, -707, -715.  Section 6-701(4) defines a "debt management company" as:

> a corporation, company, firm, partnership, association or society, as a well as a natural person, *that for compensation engages in the business of receiving money, or evidences thereof,* in this state or from a resident of this state as agent of a debtor for the purpose of distributing the same to his creditors in payment or partial payment of his obligations.

(Emphasis added.)    Various entities are exempt from the licensing requirement, such as attorneys who provide debt management incidental to other legal services, certain nonprofit organizations, and institutions licensed pursuant to other Arizona or federal laws.  *See* A.R.S. § 6-702(1), (2), (4), (5), (7), (8).

**¶23**    If an entity is engaged "in the business for compensation of receiving money . . . for the purpose of distributing the same" to creditors, the entity must first obtain a license.  A.R.S. § 6-703.  Debt management companies must submit a written application and post a bond of $5000 or more, depending on the amounts disbursed by the company.  *See* A.R.S. § 6-704(A) and (B).  Applicants must also submit a blank copy of the contract to be used with debtors, which must be updated with any post-license changes or amendments.  A.R.S. § 6-704(E).

**¶24**    Licensure is not automatic.  Once an applicant submits an application, the Superintendent begins an investigation of the company. A.R.S. § 6-707(A).  Only if the Superintendent finds "that the financial responsibility, experience, character and general fitness of the applicant are such as to command the confidence of the community to warrant belief that the business will be operated fairly and honestly and within the purposes

of [Chapter 6]" will the Superintendent issue the applicant a license to operate as a debt management company in Arizona. A.R.S. § 6-707(A).

**¶25** The operations of licensed debt management companies are extensively regulated by the Department. The statutes strictly limit the amount of fees a company may charge. *See* A.R.S. § 6-709(C) (authorized fees are (1) a retainer fee of thirty-nine dollars, or (2) a monthly fee of three-quarters of one per cent of the total indebtedness or fifty dollars, whichever is less)). Once licensed, a debt management company has multiple obligations, including: (1) maintaining a minimum amount of liquid assets; (2) entering a written contract with the debtor that can be terminated at any time and without penalty; (3) maintaining a trustee checking account at an Arizona bank into which all debtor payments must be deposited; (4) keeping business records enabling the Superintendent to determine whether the company is in compliance with Chapter 6; and (5) filing annual reports with the Superintendent. *See* A.R.S. § 6-709(A), (B), (I), (J), and (M). The statutes also make it "unlawful" for a licensed debt management company to (1) "[a]ccept an account unless it appears . . . that the debtor can reasonably meet the payments" or (2) pay others for referring debtors to the company. A.R.S. § 6-710(1), (7).

**¶26** It is undisputed that JHass did not obtain a debt management company license from the Department while conducting operations in Arizona. The question we must resolve is whether the Department properly determined that the JHass business model, as demonstrated by its practices, falls within the scope of Chapter 6's licensing requirements.

### B. Meaning of the Term "Receiving Money"

**¶27** "We interpret statutes to give effect to the legislature's intent, looking first to the statutory language itself." *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 383, ¶ 8 (2013). We construe words and phrases according to the common and approved use of the language. A.R.S. § 1–213. "In determining the ordinary meaning of a word, we may refer to an established and widely used dictionary." *State v. Mahaney*, 193 Ariz. 566, 568, ¶ 12 (App. 1999). When the language of a statute is subject to more than one reasonable meaning, "we attempt to determine legislative intent by interpreting the statutory scheme as a whole and consider the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose." *Hughes v. Jorgenson*, 203 Ariz. 71, 73, ¶ 11 (2002) (citation and internal quotations omitted).

**¶28** JHass argues it acted merely as a debt *settlement* company and therefore had no obligation to obtain a license to operate a debt *management* company. Neither Arizona statutes nor case law define a "debt settlement company." JHass describes its business model as one that allowed "consumers to maintain control over their funds." More specifically, because deposits were made into a client-controlled "third party trust account" at NoteWorld or a similar provider, JHass asserts it did not "receive" any money for the purpose of distributing to creditors, as required by § 6-701(4). Thus, JHass essentially contends that its business is a unique entity that escapes all regulation by the Department, despite providing a service that bears an uncanny resemblance to the type of organization contemplated by the statutes governing debt management companies.

**¶29** A debt management company is one that is "in the business of receiving money, or evidences thereof," for the purpose of distributing such funds to a client's creditors. A.R.S. § 6-701(4). JHass argues the Department erred in concluding that JHass' business operations constitute a debt management company within the meaning of § 6-701(4) because its plain language "unmistakably states that for its application one must be in *receipt* of money or other forms of value." The Department also maintains that § 6-701(4) is not ambiguous. According to the Department, however, the statute "covers the activity of receiving banking information if that information is used to *grant the receiving party access* to monies, even when no actual monies are received." (Emphasis added.)

**¶30** The common meaning of "receive" is "to acquire or take." Webster's II New College Dictionary 946 (3d ed. 2005). In a legal context, particularly in the realm of criminal law, "receiving" can often mean "acquiring or controlling property," as in receiving stolen property. *See* Black's Law Dictionary 1461 (10th ed. 2009) (receiving stolen property means "the criminal offense of acquiring or controlling property known to have been stolen"). Given the variation in these definitions, both parties' interpretations of "receiving money" are plausible. Because the statute is ambiguous, we turn to alternative methods of statutory construction.[3]

---

[3] JHass also argues that the phrase "receiving money, or evidences thereof" means receiving money "or other forms of value." The Department argues in its brief, and the Assistant Superintendent testified at the administrative hearing, that "receiving evidences thereof" means "*receipt of information that gives the debt management company access to money,*

¶31      Unlike other statutes found in Title 6, the provisions of Chapter 6 do not include an express declaration of purpose. *Cf.* A.R.S. § 6-181 (declaration of purposes for the chapter on Bank Organization and Regulation). In 1968, the legislature enacted A.R.S. § 6-701 as part of a larger bill "providing for the licensing and regulation of debt management companies." *See* Arizona State Senate, Minutes of State Government Committee, H.B. 38, 28th Leg., 2d. Reg. Sess. (March 4, 1968). A House Fact Sheet from a subsequent Chapter 6 amendment indicates that the purpose of the debt management statutes is to provide "protection for consumers from unscrupulous debt management companies." *See* House Fact Sheet, H.B. 2552, 41st Leg., 2d Reg. Sess. (February 15, 1994).

¶32      Absent a clear statement of purpose, legislative intent can be gleaned from the statutory scheme itself. *Hughes*, 203 Ariz. at 73, ¶ 11. As noted, Chapter 6 includes a listing of entities that are exempt from the licensing requirements. A.R.S. § 6-702. Section 6-702 states that a "bill paying service provider" is exempt from the licensing requirements as long as the provider does not "take physical possession of any debtor monies except for fees and charges for services rendered," among other requirements. A.R.S. § 6-702(9)(f). If, as JHass argues, the phrase "receiving money," as it is used in § 6-701(4) means "taking actual possession of," then this exemption would be redundant; bill paying service providers who merely control, but do not actually possess, debtors' funds would not constitute debt management companies within the language of § 6-701(4) and would not require a license to operate anyway. Likewise, if the legislature intended "receiving" to mean only actual physical possession, then presumably it would have used "receiving money" in § 6-702(9)(f), or it would have used "take physical possession" in § 6-701(4) to create a mirror image of the rule and the exception. *See Williams v. Thude,* 188 Ariz. 257, 259 (1997) (recognizing that each word and phrase of a statute "must be given meaning so that no part of it will be void, inert, redundant, or trivial"). The legislature did not draft the statutes in that manner; thus, we presume it intended the phrase "receiving money" to mean something broader than taking "physical possession."

---

that is, puts the debt management company in constructive receipt of funds." (Emphasis added.) Because we conclude that "receiving money" includes the situation in which a DSC exercises substantial control over a client's funds, we need not decide the precise meaning of "or evidences thereof."

¶**33**         This reading of the statute is supported by the few jurisdictions that have addressed the meaning of receiving money. In construing a similarly worded debt settlement statute, the California Court of Appeal held that "receiving money" means actual or constructive receipt.[4] *Nationwide Asset Servs., Inc. v. DuFauchard*, 79 Cal. Rptr. 3d 844, 848 (App. 2008) ("If plaintiffs indeed have managed to 'receive' the money of their customers in all but name, then their conduct is precisely that which the statute has targeted."); *see also Estrella v. Freedom Fin. Network, LLC*, 778 F. Supp. 2d 1041, 1045 (N.D. Cal. 2011) ("The level of control exercised over a customer's money is central to the definition of a prorater."). Similarly, the Washington Supreme Court concluded that a debt adjustment statute applied to a company that, like NoteWorld, was engaged in the business of receiving consumer funds on behalf of separate debt relief companies even though consumers retained nominal control over their accounts.[5] *Carlsen v. Global Client Solutions, LLC*, 256 P.3d 321, 325, ¶ 12 (Wash. 2011) ("It is unreasonable to suggest that the legislature intended to allow companies whose activities fit the broad statutory definition of 'debt adjusting' to nonetheless escape regulation by splitting the traditional functions of a debt adjuster between multiple entities."). Despite the company's argument in *Carlsen* that it did not "receive" funds because the consumers maintained control over their accounts and authorized every transaction, the court held that the company was engaging in debt adjusting "because [the company] receives funds into a custodial account in its own name and, after a [debt relief company] negotiates a settlement, [the company] distributes money

---

4         California's Financial Code refers to "proraters" rather than "debt management companies." *See* Cal. Fin. Code §§ 12000-12404 (West 2014). The pertinent statute defines a prorater as "a person who, for compensation, engages in whole or in part in the business of *receiving money or evidences thereof* for the purpose of distributing the money or evidences thereof among creditors in payment or partial payment of the obligations of the debtor." Cal. Fin. Code § 12002.1 (West 2014) (emphasis added).

5         The Washington statute reads: "Debt adjusting means the managing, counseling, settling, adjusting, prorating, or liquidating of the indebtedness of a debtor, or receiving funds for the purpose of distributing said funds among creditors in payment or partial payment of obligations of a debtor." Wash. Rev. Code § 18.28.010(2) (2014). This section was amended in 2012 to exempt third-party account administrators like NoteWorld from the definition of "debt adjuster." *Compare* Wash. Rev. Code § 18.28.010(1)(b) (2014) *with* Wash. Rev. Code § 18.28.010(1)(b) (2011); *see also Wheeler v. NoteWorld, LLC*, CV 10-0202, 2012 WL 3061489, at 1, ¶ 2 (E.D. Wash. July 26, 2012).

to the creditor in payment or partial payment of the consumer's debt." *Id.* at 324, ¶ 10. In so holding, the court noted that "the debt adjusting statute should be construed liberally in favor of the consumers it aims to protect." *Id.* at 326, ¶ 17.

**¶34**　　　　Consistent with the Washington Supreme Court's reasoning in *Carlsen*, it would be unreasonable to construe A.R.S. § 6-701(4) to allow a company to avoid licensure simply by splitting its operations into multiple entities, then putting one in charge of receiving money and another in charge of distribution. *See Carlsen*, 256 P.3d at 325, ¶ 12; *see also Browne v. Nowlin*, 117 Ariz. 73, 77 (1977) (holding a lender could not circumvent a statutory prohibition against collecting certain fees by using a third-party escrow agent as a camoflauge); *Perini Land & Dev. Co. v. Pima County*, 170 Ariz. 380, 383 (1992) ("If enforcing the clear language of the constitution results in an absurd situation, the court may look behind the bare words of the provision to discern its intended effect."). And it is no consolation to say, as JHass has argued, that client funds were deposited first into third-party trust accounts that the client could cancel at any time, because Chapter 6 expressly requires all *licensed* debt management companies to do the same. A.R.S. § 6-709(B), (I). Moreover, as the Department observed during its investigation, JHass charged clients a "monthly maintenance fee" which, by the very terms of the Client Partnership Agreement, was used to "cover the cost of trust account administration." Thus, JHass not only controlled the allocation and disbursement of client funds held in third-party trust accounts, but also received a fee for such services.

**¶35**　　　　The burdens of licensure for a debt management company are the benefits to the consumer. Continued licensure with the Department requires comprehensive recordkeeping. A.R.S. § 6-709(J). Licensed companies are required to be bonded and maintain a designated amount of liquid assets in excess of liabilities. A.R.S. §§ 6-704(B), -709(A). Licensed companies may not charge exorbitant fees, and must evaluate a consumer's ability to pay before accepting an account. A.R.S. §§ 6-709(C), -710(1). With these strictures in place, the Department can monitor business practices to prevent fraud and mishandling of consumer funds, while also ensuring a company has sufficient resources to settle claims with consumers should something go awry. In sum, Arizona's statutes require that debt management companies be licensed to operate for the purpose of protecting consumers. We therefore hold that for purposes of determining whether a particular entity requires licensing as a debt management company, that entity "receives" money if it exercises substantial control over client funds.

### C.    Substantial Evidence

**¶36**        JHass also argues the ALJ erred in finding that JHass was a debt management company because the Department introduced no evidence that funds were actually disbursed by JHass to a creditor.  We disagree with JHass' suggested interpretation of § 6-701(4).  The statute defines a debt management company as a company engaged in the business of receiving money "for the purpose of distributing" such funds to creditors.  A.R.S. § 6-701(4).  It does not mandate that the company actually distribute funds to creditors.  If a company were to receive monthly payments directly from clients under the promise that those funds would be used to pay creditors, that company's activities would undeniably come within the purview of § 6-701(4), even if the company had not disbursed the funds collected.  By extension, the same must be true then for companies that receive money by exerting control over client funds held in a third-party account to which the company has substantial access.  The ALJ correctly found that § 6-701(4) applies to companies which constructively receive client funds for the purpose of distributing the same to creditors.  Thus, the Department was not required to prove JHass actually distributed any funds to creditors; that JHass substantially controlled the funds held in NoteWorld accounts deposited by clients, intending that those funds be used to pay creditors, is sufficient evidence to support the Department's order.

**¶37**        JHass further argues that evidence presented at the hearing established that clients actually retained significant control over their own accounts and therefore insufficient evidence exists in the record to support the ALJ's finding of JHass' control.  In this administrative appeal, we do not weigh the evidence; instead, our role is only to determine whether there was substantial evidence to support the administrative decision. *Carondelet Health Servs. v. Ariz. Health Care Cost Containment Sys. Admin.*, 182 Ariz. 502, 504 (App. 1995).  "If an agency's decision is supported by the record, substantial evidence exists to support the decision even if the record also supports a different conclusion."  *Gaveck*, 222 Ariz. at 436, ¶ 11.

**¶38**        In concluding JHass acted as a debt management company under § 6-701(4), the ALJ made separate findings of fact, which the Department adopted in full when issuing its final order.  The ALJ heard testimony from a NoteWorld "Operations Manager" who testified regarding JHass' access to clients' NoteWorld accounts and ability to modify, cancel, and refund disbursements from those accounts to itself and to creditors.  The ALJ also heard from former JHass clients who testified that they (1) did not know that the company holding their money was

NoteWorld; (2) believed NoteWorld and JHass were part of the same entity; or (3) knew their money was held in NoteWorld, but they resolved their money management issues by dealing directly with JHass. Addressing the issue of whether JHass received money, the ALJ ultimately concluded that "the weight of the evidence of record established that JHass [] was in constructive receipt or possession of its clients' funds by virtue of the authority and control that it was able to exercise over those funds."

¶39　　JHass relies on NoteWorld's stated policy that it would not disburse any funds without a written settlement letter from a creditor. However, a NoteWorld representative testified that while NoteWorld's *policy* was to disburse only if a settlement letter was actually received, NoteWorld *in fact* did not have any mechanism in place to verify that a settlement letter was received. Moreover, once a credit was scheduled by JHass, the disbursement to creditors would go forward unless the client notified NoteWorld within 24 hours that he or she did not wish to have those funds disbursed. What JHass describes as the "ability to countermand any transfer" is, according to the testimony of a NoteWorld representative and the NoteWorld Sign-up Agreement itself, actually a much more limited right to cancel a disbursement pre-scheduled by JHass.

¶40　　Finally, JHass argues the ALJ erred because "the Department's overreaching description of [JHass'] access to the NoteWorld system is not supported by the record." In doing so, JHass directs us to various points in the record where former JHass clients testified to contacting NoteWorld directly, or to accessing their NoteWorld accounts online. However, the record also includes substantial testimony describing the extent of JHass' access to clients' accounts and the limited recourse clients had for clawing back disbursements to creditors, as well as a letter from NoteWorld's counsel to the Department agent describing JHass' authority and access. In fact, JHass does not dispute it had some control over clients' NoteWorld accounts, at least for the purposes of scheduling debits to pay its own fees. Thus, even if JHass clients did have some ability to countermand a payment, we find substantial evidence within the record supporting the ALJ's conclusion that the totality of the evidence, including the authorizations JHass does not dispute it had, demonstrated that JHass exercised substantial control over clients' accounts and the funds therein.

## CONCLUSION

¶41　　Substantial evidence supports the ALJ's finding that JHass was engaged in the business of a debt management company in Arizona. The Department did not act arbitrarily, capriciously, or in an abuse of

discretion in imposing a civil penalty and ordering JHass to cease its unlicensed operations as a debt management company. We therefore affirm the judgment of the superior court.



Ruth A. Willingham · Clerk of the Court
FILED: ama