379 P.3d 263

## MCCARTHY INTEGRATED SYSTEMS, LLC, an Arizona limited liability company, Plaintiff/Appellant,

v.

## EVOQUA WATER TECHNOLOGIES, LLC, a Delaware limited liability company; MISCOwater, LLC, a California limited liability company, Defendants/Appellees.

No. 1 CA–CV 14–0710

Court of Appeals of Arizona, Division 1.

FILED 8/16/2016

Graif Barrett & Matura, P.C., Phoenix, By E. Scott Dosek, Amanda J. Taylor, Counsel for Plaintiff/Appellant

Coppersmith Brockelman, PLC, Phoenix, By Andrew S. Gordon, Shelley Tolman, Counsel for Defendant/Appellee Evoqua Water Technologies

Ballard Spahr, LLP, Phoenix, By John G. Kerkorian, Christopher Moeser, Counsel for Defendant/Appellee MISCOwater

Judge Randall M. Howe delivered the opinion of the Court, in which Presiding Judge Kent E. Cattani and Judge Samuel A. Thumma joined.

## OPINION

HOWE, Judge:

¶ 1 This appeal is based on a distribution agreement between McCarthy Integrated Systems, LLC ("McCarthy") and Evoqua Water Technologies, LLC ("Evoqua"). McCarthy argued that Evoqua wrongfully terminated their agreement for chlorination machines in violation of the Equipment Dealers Act, A.R.S. §§ 44–6701–6709 ("the Act"). Evoqua moved to dismiss McCarthy's complaint, arguing that the Act does not protect agreements for chlorination machines. The trial court denied McCarthy's request for provisional relief and granted Evoqua summary judgment. McCarthy appeals from that judgment.

¶ 2 We hold that the trial court did not err in dismissing McCarthy's complaint because the Act does not apply to or protect the agreement with Evoqua for chlorination machines. Additionally, we hold that "equipment" for purposes of the Act includes only machines related to farming and agriculture.

## FACTS AND PROCEDURAL HISTORY

¶ 3 McCarthy maintains and repairs chlorination machines and related parts used in the water and wastewater industries. It also sells the chlorination machines and related parts. These machines add regulated amounts of chlorine, bromine, and hydrogen peroxide to disinfect drinking and wastewater and to process water for pumps and the beverage and electric power industries. Among McCarthy's largest customers are municipalities in Arizona and Nevada, Salt River Project, Arizona Public Service, and food manufacturers. McCarthy's owner stated that the company's other customers are "anybody who uses chlorine ... that's what we specialize in."

¶ 4 In October 2009, McCarthy entered into a distribution agreement with Siemens Water Technologies—which Evoqua later acquired—a manufacturer of water treatment products, including chlorination machines. The agreement authorized McCarthy to service and sell specified Evoqua aftermarket parts to existing water treatment systems exclusively in Arizona and four Nevada counties. The agreement stated that McCarthy could sell the specified aftermarket parts only to a "water or wastewater processing or treatment facility owned or operated by ... any municipal tax-funded entities ... or a private company that provides the equivalent of municipal water or wastewater treatment services." The agreement further provided that for an initial period of one year, only Evoqua could terminate the agreement "for cause." After that time, either party could terminate the agreement "at any time for any reason without cause with written notice sent by registered or certified mail 30 days prior to the effective date of such termination."

¶ 5 On July 17, 2014, Evoqua sent McCarthy a 30-day notice of termination without cause, effective August 16, 2014. Three days before the termination took effect, McCarthy sued Evoqua, alleging that Evoqua's notice of termination violated the Act, which prohibits suppliers of "equipment" from terminating "dealer agreements" without cause, regardless of the agreements' terms or choice-of-law provisions. McCarthy also alleged that Evoqua had breached their agreement by falsely identifying MISCOwater, LLC, on its website as the only Evoqua distributor in Arizona and the four Nevada counties that McCarthy had served. McCarthy named MISCOwater as a defendant, alleging that it tortiously interfered with the agreement. In addition to seeking damages, McCarthy sought a temporary restraining order and preliminary and permanent injunctions prohibiting Evoqua from terminating the agreement.

¶ 6 At the hearing to show cause for the temporary restraining order and preliminary injunction, McCarthy argued that the Act's definition of "equipment," which includes machines used for "light industrial and utility purposes," encompassed its chlorination machines. McCarthy contended that because its largest customers used the chlorination machines in the light industry of food manufacturing and in the public utility industry to generate and provide electricity and water, the Act applied and prohibited Evoqua from terminating their agreement without cause.

¶ 7 Evoqua argued, however, that the Act did not apply to the distribution agreement for chlorination machines. Relying on the Act's legislative history, Evoqua maintained that the legislature intended "equipment" to include only farming and agricultural equipment, not chlorination or water treatment machines and parts. Evoqua introduced legislative committee minutes, which included testimony from a farm equipment dealers' association representative stating that the Act was necessary to address problems in the farm equipment industry. Evoqua argued that because the Act did not apply to their agreement, the agreement's terms—allowing for termination without cause upon 30-day notice—remained in effect. Evoqua contended that because it provided McCarthy with the required notice of termination, it commit-

ted no wrong and McCarthy had no cause of action.

¶ 8 Concluding that the parties' competing interpretations were both reasonable, the trial court found the definition of "equipment" ambiguous. After considering the Act's legislative history, however, the trial court found that the Act protected only agreements relating to equipment used in the agricultural industry, which did not include McCarthy's chlorination machines. Without objection, the trial court converted the hearing into one for summary judgment pursuant to Arizona Rule of Civil Procedure 56. The trial court ruled that as a matter of law the Act did not apply to the agreement. Accordingly, the trial court granted summary judgment against McCarthy. McCarthy timely appealed.

## DISCUSSION

### 1. "Equipment" Under the Act

¶ 9 McCarthy argues that the trial court erred by granting Evoqua summary judgment and holding that the Act did not apply to the agreement because the machines—used for water treatment by food manufacturers and public utility providers—are used for "light industrial and utility purposes." We review de novo the trial court's grant of summary judgment. *Friedman v. Cave Creek Unified Sch. Dist. No. 93*, 231 Ariz. 567, 568–69 ¶ 8, 299 P.3d 182, 183–84 (App. 2013). Summary judgment is appropriate when no genuine issues of material fact exist and the non-moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(c). We also review issues involving statutory interpretation de novo. *Azore, LLC v. Bassett*, 236 Ariz. 424, 427 ¶ 8, 341 P.3d 466, 469 (App. 2014). Because the Act did not apply to or protect the distribution agreement between McCarthy and Evoqua, the trial court did not err in granting Evoqua summary judgment.

¶ 10 We interpret statutes to give effect to the legislature's intent. *JHass Grp. L.L.C. v. Ariz. Dep't of Fin. Insts.*, 238 Ariz. 377, 384 ¶ 27, 360 P.3d 1029, 1036 (App. 2015). In doing so, we look to the statute's plain language as the best indicator of that intent. *Azore*, 236 Ariz. at 427 ¶ 9, 341 P.3d at 469. We construe words and phrases according to

their ordinary meanings, A.R.S. § 1–213, but do not read words in statutes in isolation from the context in which they are used, *J.D. v. Hegyi*, 236 Ariz. 39, 41 ¶ 6, 335 P.3d 1118, 1120 (2014). A statute is ambiguous if the meaning or interpretation of its terms is uncertain, subjecting it to more than one reasonable interpretation. *Stein v. Sonus USA, Inc.*, 214 Ariz. 200, 201 ¶ 3, 150 P.3d 773, 774 (App. 2007); *Bentley v. Building Our Future*, 217 Ariz. 265, 270 ¶ 13, 172 P.3d 860, 865 (App. 2007). In such cases, we attempt to determine the legislative intent by looking to the canons of statutory construction and considering the statute's context; its language, subject matter, and historical background; its effects and consequences; and its spirit and purpose. *Stein*, 214 Ariz. at 201 ¶ 3, 150 P.3d at 774; *State v. Barnett*, 209 Ariz. 352, 355 ¶ 12, 101 P.3d 646, 649 (App. 2004).

¶ 11 As relevant here, the Act prohibits suppliers of "equipment" from terminating "dealer agreements" without cause. A.R.S. §§ 44–6702(A)(3), –6703(B). A "dealer agreement" is a "contract or agreement of definite or indefinite duration between a supplier and an equipment dealer that prescribes the rights and obligations of each party with respect to the purchase or sale of equipment." A.R.S. § 44–6701(1). The Act defines "equipment" as "machines designed for or adapted and used for agriculture, livestock, grazing, light industrial and utility purposes." A.R.S. § 44–6701(2). "Equipment" specifically "does not include earthmoving and heavy construction equipment, mining equipment or forestry equipment." *Id.*

¶ 12 McCarthy does not argue that its chlorination machines are "machines designed for or adapted and used for agriculture, livestock, grazing" purposes, but maintains that the machines are still covered under the phrase "light industrial and utility purposes." McCarthy posits that its chlorination machines are used for "light industrial ... purposes" because they are used in light industries such as food manufacturing. McCarthy similarly suggests that the machines are used for "utility purposes" because they are used for the generation and provision of public utilities like electricity and water. Evoqua argues, however, that

because the Act does not define "light industrial" or "utility," the definition is ambiguous. Evoqua argues further that read in its historical context, the definition encompasses only equipment relating to farming and agriculture, such as all-terrain utility vehicles.

¶ 13 Both McCarthy's and Evoqua's interpretations are reasonable, and the plain language does not indicate which interpretation the legislature intended. Specifically, the Act does not define either "light industrial" or "utility," and construing the words according to their ordinary meanings does not resolve whether "equipment" includes chlorination machines. Ordinarily, "light industrial" can refer to either a small industry that produces consumer goods or industrial equipment that performs non-heavy work. Likewise, "utility" can ordinarily refer to either a public utility or to something designed for practical use. These ordinary meanings reasonably support either McCarthy's or Evoqua's proposed interpretations. Accordingly, the meaning of "equipment" is ambiguous.

■ ¶ 14 Because it is ambiguous, we look beyond the plain language by applying canons of statutory construction and considering the statute's legislative history. *See Stein*, 214 Ariz. at 201 ¶ 3, 150 P.3d at 774. The canon *noscitur a sociis* dictates that a statutory term is interpreted in context of the accompanying words. *Estate of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 326 ¶ 13, 266 P.3d 349, 352 (2011). Here, the context surrounding "light industrial and utility purposes" supports Evoqua's interpretation that the Act applies to equipment relating to farming and agriculture. Specifically, the named uses of equipment in the statute—agriculture purposes, livestock purposes, and grazing purposes—each unequivocally relate to farming and agriculture. Interpreting the statute to encompass equipment of any other industry or use would be inconsistent with the other words of the statute. *See Welch–Doden v. Roberts*, 202 Ariz. 201, 206 ¶ 22, 42 P.3d 1166, 1171 (App. 2002) ("In construing statutes, we have a duty to interpret them in a way that promotes consistency, harmony, and function.").

¶ 15 The Act's legislative history similarly reflects that "equipment" includes only machines relating to farming and agriculture, not to chlorination machines like those that McCarthy services and sells. The legislature added the Act in 1993. *See* Laws 1993, Ch. 217, § 1 (1st Reg. Sess.). The Act responded to a decade of mergers in the farm equipment industry that left dealers that had large investments in their businesses without protection or recourse when the mergers forced them out of their agreements. *Hearing on H.B. 2268 Before the H. Comm. on Commerce*, 41st Leg. 1st Reg. Sess. (1993). A farm equipment dealers' association representative explained that bills with similar language and purposes had been passed in forty-one other states, including California, to balance power between suppliers and dealers and provide needed protection. *Hearing on H.B. 2268 Before the H. Comm. on Natural Res., Agric. & Rural Dev.*, 41st Leg. 1st Reg. Sess. (1993). Representatives from John Deere and Bingham Equipment Company, a supplier and a dealer of farming and agricultural equipment, further stated that the Act offered an equitable solution to the problem. *Hearing on H.B. 2268 Before the S. Comm. on Commerce & Econ. Dev.*, 41st Leg. 1st Reg. Sess. (1993). One legislator inquired about the possibility of providing similar protection "in other areas besides farm equipment." *Hearing on H.B. 2268 Before the H. Comm. on Commerce*, 41st Leg. 1st Reg. Sess. (1993). The association representative responded that the bill "was drafted to address problems in the farm equipment industry." *Id.* Notably absent from the Act's legislative history is input from suppliers or dealers of equipment from other industries, including the food manufacturing and public utility industries.

¶ 16 Considering the Act's history, the trial court did not err in granting summary judgment in Evoqua's favor because McCarthy's chlorination machines are not "equipment" used for "light industrial and utility purposes." The aftermarket chlorination machines and parts McCarthy serviced and sold under the distribution agreement perform only one task: adding regulated amounts of disinfecting chemicals to water, wastewater, and water processes. These

chlorination machines are used by food manufacturers, municipalities, rendering plants, and public utility corporations. Nothing in the record suggests that the machines are used in farming or agriculture. In fact, the agreement permitted McCarthy to service and sell the machines and parts only to municipal water and wastewater processing and treatment facilities, or to private companies that provide the equivalent of water or wastewater treatment. Because the chlorination machines are not "equipment" as defined in the Act, the Act did not protect the distribution agreement between McCarthy and Evoqua.

¶17 McCarthy counters that the trial court erred in relying on the testimony from the equipment dealers' association representative to discern legislative intent. But when attempting to find a shared legislative understanding of the relevant language, the courts may consider committee hearing minutes. *Haag v. Steinle*, 227 Ariz. 212, 214 ¶10, 255 P.3d 1016, 1018 (App. 2011). Although courts generally give little to no weight to comments made at committee hearings by non-legislators, the courts may consider such comments when circumstances provide sufficient guarantees that the comments reflect the legislators' views. *Hayes v. Con't Ins. Co.*, 178 Ariz. 264, 269, 270, 872 P.2d 668, 673, 674 (1994). Such guarantees exist when the comments directly address a legislator's expressed concerns about the matter at issue. *City of Tucson v. Clear Channel Outdoor, Inc.*, 209 Ariz. 544, 558 ¶67, 105 P.3d 1163, 1177 (2005). The trial court did not err here.

¶18 Finding "equipment" ambiguous, the trial court properly turned to the Act's historical background to discern the legislative intent. The representative's comment that the bill was drafted to address problems in the farm equipment industry directly addressed a legislator's inquiry about the possibility of expanding a similar protection to areas other than farm equipment. The type of equipment the Act protects is precisely the matter at issue here. Thus, the circumstances provide sufficient guarantees that the representative's comments reflected the legislator's views because they directly addressed the legislator's concerns on the contested

issue. Moreover, the record shows that the trial court relied generally on legislative history and its own understanding of the Act's language, not solely on the representative's committee testimony. Accordingly, the legislative history supports the conclusion that the legislature intended the Act to cover only machines related to farming and agriculture, and the trial court did not err in holding that McCarthy's chlorination machines are not "equipment."

¶19 A California federal district court came to a similar conclusion in interpreting the California Equipment Dealers Act ("CEDA"), which used similar language to define "equipment." *Badger Meter Inc. v. Vintage Water Works Supply, Inc.*, 341 F.Supp.2d 1115 (N.D. Cal. 2004). In *Badger Meter*, the court considered whether water meters are "equipment"—which under the statute effective at the time included machines used in "agriculture, livestock, grazing, light industrial and utility." 341 F.Supp.2d at 1120. The court looked at CEDA's legislative history, including committee testimony by a representative from the same farm equipment dealers' association that testified in Arizona. *Id.* at 1120–21, 1122. The court also noted that, like here, no representatives from the water pipe industry or a related industry were involved in CEDA's enactment. *Id.* at 1121. Based on this history, the court concluded that CEDA only applied to farm equipment dealers, not water meter dealers. *Id.* at 1120.

¶20 McCarthy argues finally that aside from legislative history, other Arizona statutes indicate that "utility" means a public utility service. McCarthy cites A.R.S. § 40–491, defining "utility" as "any public service corporation ... engaged in the generation, transmission, or delivery or electricity ... or water service." It argues that because the legislature incorporated this definition by reference in A.R.S. § 44–301—which is in the same statutory title as the Act—this Court should apply the same definition to the Act. However, both A.R.S. § 40–491 and A.R.S. § 44–301 specifically state that the definition applies "in this article." Because the Act is in a different article than those statutes, that definition does not apply. Indeed, if the legis-

lature had intended to incorporate this definition in the Act, it could have done so. *See MacKinney v. City of Tucson*, 231 Ariz. 584, 587 ¶ 9, 299 P.3d 1282, 1285 (App. 2013) (providing that we presume that the legislature is aware of existing law when it enacts a statute). Thus, the trial court did not err in ruling that the Act did not apply to McCarthy's agreement.

### 2. Attorneys' Fees

¶ 21 McCarthy requests attorneys' fees on appeal pursuant to A.R.S. § 12–341.01. Evoqua requests attorneys' fees on appeal pursuant to A.R.S. §§ 12–341.01 and 44–6708(A).

Because McCarthy is not the successful party, we deny its request. Because Evoqua is the successful party, however, we grant its request, subject to compliance with Arizona Rule of Civil Appellate Procedure 21.

### CONCLUSION

¶ 22 For the foregoing reasons, we affirm.